# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
(Filed:  July 20, 2016)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| LUCAS HINOJOSA, | * | Unpublished |
| | * | |
| Petitioner, | * | No. 14-827 |
| v. | * | |
| | * | Attorneys' Fees and Costs; Contested |
| SECRETARY OF HEALTH | * | Reasonable Basis. |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

Ronald Homer, Conway, Homer & Chin-Caplan, P.C., Boston, MA, for petitioner.
Adriana Teitel, U.S. Department of Justice, Washington, DC, for respondent.

### DECISION ON FINAL ATTORNEYS' FEES AND COSTS[1]

**Roth,** Special Master:

On September 8, 2014, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.,*[2] (the "Vaccine Act"). Petitioner alleged that he suffered from "an injury, including, but not limited to, neuropathy and myositis" as a result of an influenza ("flu") vaccination administered to him on September 20, 2011.  Petition ("Pet.") at 1.  On August 31, 2015, Chief Special Master Nora Beth Dorsey issued a decision dismissing petitioner's claim for insufficient proof.  Decision, ECF No. 31.  Petitioner now requests an award for attorneys' fees and costs pursuant to §15(e). After careful consideration, the undersigned has determined to **grant the request in full** for the reasons set forth below.

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, the undersigned intends to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.      FACTS

Petitioner received a flu vaccine on September 20, 2011. Petitioner's Exhibit ("Pet. Ex.") 1 at 1. Prior to vaccination, he was a healthy 31 year old man who "exercised regularly" and was active both at work and at home. Pet. Ex. 15 at 1; Pet. Ex. 2 at 1-6.  According to petitioner's affidavit, his legs ached during his evening run on September 20, 2011, the day he received the allegedly causal vaccination, and felt sore afterwards; that night, he also had "chills and felt feverish" but claimed he did not have a fever. Pet. Ex. 15 at 2. He stated that he was unable to exercise regularly and his fatigue worsened over the next few weeks. *Id.* Petitioner visited his primary care physician, Dr. Alvaro Zamora, on October 19, 2011, complaining of fatigue, feeling foggy, "flashers in vision," occasional headaches, forgetting his train of thought, and muscle weakness. Pet. Ex. 2 at 7. Dr. Zamora noted that the "[e]pisodes were more pronounced and more often after flu shot a few weeks ago." *Id.* Dr. Zamora's assessment was fatigue and malaise and he ordered several laboratory tests. Pet. Ex. 2 at 7-9. At a follow-up appointment on November 1, 2011, petitioner stated that in addition to worsening fatigue, he also had mood swings, an inability to concentrate, and lack of libido. Pet. Ex. 2 at 10.  Dr. Zamora discussed petitioner's laboratory results with him and expanded petitioner's diagnosis to include hypogonadism, vitamin B-2 deficiency, and vitamin D deficiency. Pet. Ex. 2 at 10-11.

On December 15, 2011, petitioner met with a neurologist, Dr. Mavis Fujii. Dr. Fujii noted that petitioner complained of "fatigue, leg pain, some difficulty moving his legs, and some blurred vision." Pet. Ex. 4 at 44. Petitioner was also experiencing shaking and numbness in his upper extremities. *Id.* Dr. Fuji's impression was "[p]roximal upper and lower extremity weakness after a flu shot." *Id.* at 46. Petitioner had nerve conduction studies and electromyography ("EMG") of his lower extremities on December 20, 2011; the results were "consistent with a distal demyelinating motor polyneuropathy." *Id.* at 35-40. A brain MRI performed that same day showed sinusitis. *Id.* at 63. A magnetic resonance image ("MRI") of petitioner's cervical spine showed a small disc protrusion at C7-T1, while an MRI of petitioner's thoracic spine showed a disc protrusion at T7-T8 causing a "mild impression upon the right ventral cord." *Id.* at 64-65. Petitioner also had small disc protrusions at T5-6, T6-7, T10-11, and T12-L1, none of which had "definite nerve root impingement." *Id.* at 65. Petitioner had nerve conduction studies and an EMG of his upper extremities on December 28, 2011; the results were again "consistent with a distal demyelinating [sic] motor polyneuropathy." *Id.* at 21.

Petitioner had a follow-up appointment with Dr. Fujii on January 9, 2012; Dr. Fujii noted that petitioner was experiencing increased leg pain and weakness. *Id.* at 13-15. She recommended an MRI of petitioner's lumbar spine, as well as intravenous immunoglobulin ("IVIG") and a lumbar puncture. *Id.* at 15. Petitioner had a lumbar puncture on January 17, 2012. Pet. Ex. 3 at 296. On the same day as the procedure, petitioner developed a headache and neck pain; at an ER visit on January 18, 2012, petitioner was diagnosed with a post-lumbar puncture headache and was given an epidural blood patch. Pet. Ex. 3 at 163, 184-186. At a follow-up appointment with Dr. Fujii on February 3, 2012, Dr. Fujii noted that petitioner was still complaining of nerve pain and right leg pain after the lumbar puncture. Pet. Ex. 4 at 10-12. Petitioner had an MRI of his lumbar spine on February 13, 2012; it showed "L5-S1 broad-based disc protrusion" and "shallow disc bulges at L4-L5 and T12-L1" however, none had nerve root contact. *Id.* at 62.

On February 21, 2012, petitioner presented to the ER with difficulty walking and weakness. Pet. Ex. 8 at 4. He had a follow-up appointment with Dr. Fujii on February 24, 2012; she noted that petitioner "had 2 episodes when he couldn't stand [and] had to sit down," and another episode "where [he] couldn't stand/support self," which lasted about 15 minutes. Pet. Ex. 4 at 7-9. Dr. Fujii ordered a muscle biopsy and advised petitioner to go on short term disability. *Id.* at 8. Petitioner had a left thigh muscle biopsy on March 13, 2012. Pet. Ex. 3 at 12-13. The biopsy results were mild to moderate "type I fiber atrophy." Pet. Ex. 7 at 1-2.

Petitioner saw a second neurologist, Dr. Robert Glenn Smith, on May 11, 2012. Dr. Smith noted that the progression of petitioner's symptoms may suggest a "post vaccination polyneuritis"; alternatively, petitioner's progression suggests "that a metabolic problem, unmasked by the post-vaccination myalgias, is currently worsening." Pet. Ex. 10 at 43. Petitioner underwent a non-ischemic forearm exercise test on October 16, 2012; results indicated that petitioner's ongoing metabolic problem was likely to be longstanding. *Id.* at 20. At a follow up appointment with Dr. Smith on March 8, 2013, petitioner was noted to have myalgia and muscle weakness. *Id.* at 6.

## II.    PROCEDURAL HISTORY

Petitioner filed his petition on September 8, 2014. Pet. He filed several medical records and other supporting documentation, labeled as exhibit numbers 1 through 16, along with a statement of completion the following day. Medical Records, ECF Nos. 5, 6, 7; Statement of Completion, ECF No. 8. This case was initially assigned to now- Chief Special Master Dorsey. Notice of Assignment, ECF No. 4. Respondent filed her Rule 4(c) Report on January 7, 2015, advising that "[p]etitioner has not provided sufficient proof of vaccine causation to be awarded compensation." Respondent's Report, ECF No. 14 at 9-11. Following the filing of respondent's report, Chief Special Master Dorsey ordered the parties to propose "a schedule for the filing of expert reports." Order, ECF No. 15. Petitioner was ordered to file an expert report, along with outstanding medical records, by March 23, 2015. Orders, ECF Nos. 17, 20.

Over the next several months, petitioner submitted additional medical records and asked for several extensions of time to file an expert report. Medical Records, ECF Nos. 18, 21, 24; Motions ECF Nos. 19, 22, 26.  Chief Special Master Dorsey granted the motions for extension of time, giving petitioner until July 21, 2015 to determine how he would like to proceed.  Orders, ECF Nos. 20, 23, 27.  On July 21, 2015, petitioner's counsel filed a status report, along with a motion for extension of time, explaining that counsel "does not intend to proceed further with petitioner's case in the Vaccine Program . . . [however] petitioner requires additional time to determine how he wishes to proceed with his claim."  Motion, ECF No. 28. Petitioner moved to dismiss his petition on August 18, 2015 and Chief Special Master Dorsey issued a decision dismissing the petition for insufficient proof on August 31, 2015. Motion, ECF No. 30; Decision, ECF No. 31.

This case was reassigned to me on October 19, 2015. Order, ECF No. 36. On February 3, 2016, petitioner filed a motion ("Motion") for attorneys' fees and costs. Motion, ECF No. 38. Petitioner requested attorneys' fees in the amount of $21,743.90, attorneys' costs in the amount

of $1,856.96, and petitioner's costs, in compliance with General Order #9, in the amount of $350.00; the total amount initially requested was $23,950.86. *Id.* at 1.

On February 22, 2016, respondent filed a response ("Response") to petitioner's motion. Response, ECF No. 40. Respondent questioned whether the case record established a reasonable basis for bringing this claim. *Id.* at 1. After a detailed review of the procedural history and billing records in this case, respondent argued that petitioner did not have a reasonable basis for filing this case. *Id.* at 7-11. She states that petitioner's counsel's firm, Conway, Homer, Chin-Caplan ("CHCC") filed "without performing fundamental due diligence," stating "petitioner and CHCC had sufficient time to consult with an expert regarding the scientific and medical merits to his alleged vaccine caused injury prior to filing the petition." *Id.* at 10. Furthermore, respondent stated that although she "disagrees with the analysis and findings in [*McCulloch*[3]], [she] has determined that her resources are not wisely used by continuing to litigate the issues addressed in that decision." *Id.* at 11.

On March 11, 2016, petitioner filed a reply[4] ("Reply"). Reply, ECF No. 42. Petitioner argues that respondent's suggestion to obtain an expert report before filing his petition in order to "perform 'fundamental due diligence'" contravenes advice from other "Special masters [who] have warned petitioners and their counsel from incurring expert costs prior to filing a claim if the claim involves an injury that may be compensated." *Id.* at 6, 15. Petitioner emphasized that he was "diagnosed with injuries that have been repeatedly compensated in the [Vaccine] Program." *Id.* at 14.

Petitioner filed a supplemental motion for attorneys' fees and costs ("Motion 2") on March 11, 2016. Supplemental Motion, ECF No. 43. In this motion, he requested an additional $4,789.00 for preparing the aforementioned reply. *Id.* at Tab A. Therefore, petitioner's total request is $26,532.90 in attorneys' fees, $1,856.96 for attorneys' costs, and $350.00 for petitioner's costs, for total award of $28,739.86. Respondent did not file a response to petitioner's Motion 2, and therefore the matter is now ripe for review.

## III.   APPLICABLE LAW

In general, the Vaccine Act permits an award of reasonable attorneys' fees and costs. §15(e). Determining whether an application for fees is reasonable is a matter within the discretion of the presiding special master. *See Carrington v. Sec'y of HHS,* 85 Fed. Cl. 319, 322-23 (Dec. 10, 2008). Special masters are afforded considerable discretion when considering motions for attorney fees. For instance, it is within a special master's discretion to reduce fees *sua sponte,* without warning to petitioners. *Sabella v. Sec'y of HHS,* 86 Fed. Cl. 201, 208-09 (Mar. 2, 2009).

---

[3] *McCulloch v. Sec'y of HHS,* No. 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015), *denying reconsideration*, 2015 WL 6181910.

[4] This reply was filed and docketed as a response to respondent's opposition to petitioner's application for attorneys' fees and costs. *See* Reply, ECF No. 42.

When considering motions for attorney fees and costs, the Court employs the lodestar method to determine the amount an attorney should be compensated for. *Schueman v. Sec'y of HHS,* No. 04-693V, 2010 WL 3421956 (Fed. Cl. Spec. Mstr. Aug. 11, 2010); *see also Blanchard v. Bergeron,* 489 U.S. 87, 94 (1989) ("The initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.") (internal citations omitted). That said, a special master is not required to conduct a "line-by-line" analysis of a fee request. *Broekelschen v. Sec'y of HHS,* 102 Fed. Cl. 719, 729 (Oct. 31, 2011). Additionally, a special master is "entitled to use…prior experience in reviewing fee applications," including experience with particular attorneys. *Riggins v. Sec'y of HHS,* 406 Fed. Appx. 479, 481 (Fed. Cir. 2011) (citing *Saxton v. Sec'y of HHS,* 3 F.3d 1519, 1521 (Fed. Cir. 1993)).

Specific hourly rates have been set for the attorneys of CHCC in 2014 and 2015 cases. *McCulloch v. Sec'y of HHS,* 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015). Special Master Gowen held that Washington, DC forum rates should apply to CHCC fees. He particularly noted that petitioner's counsel's firm, CHCC, is "one of the most active firms in the representation of petitioners in the Vaccine Program"; additionally, "[s]pecial masters have noted in other cases that the firm does high quality work for its petitioners." *Id.* at *3, *19. Furthermore, Special Master Gowen established hourly billing rates of $400 and $300 for 2014 to present, for the attorneys representing this petitioner, Ronald Homer and Christine Ciampolillo, respectively.

Applying these standards, the undersigned finds, for the reasons discussed below, that an award of attorneys' fees and costs is reasonable and appropriate in this case.

## IV.    DISCUSSION

Petitioner's counsel initially requested $23,600.86 in attorneys' fees and costs and $350.00 in petitioner's costs. Motion, at 1. In a supplemental motion, petitioner's counsel requested an additional $4,789.00 in attorneys' fees. Motion 2 at 1.

In her response to petitioner's initial motion, respondent asserted two objections. Response at 6-11. She stated that petitioner had not established a reasonable basis to pursue this petition and the hourly rates sought for CHCC attorneys were not reasonable. *Id.* Each issue will be discussed in turn.

### 1.    Challenges to reasonable basis.

The Vaccine Act permits an award of reasonable attorneys' fees and costs, if the petition was "brought in good faith and there was a reasonable basis." §15(e)(1). "Neither the Federal Circuit nor [the United States] Court [of Federal Claims] has had occasion to define the meaning of 'reasonable basis' for purposes of fee awards under the Vaccine Act," but it has been interpreted in several cases. *See, e.g., Woods v. Sec'y of HHS,* 105 Fed. Cl. 148, 153 (June 4, 2012).

Reasonable basis is typically viewed as "an objective standard determined by the 'totality of the circumstances.'" *Chuisano v. United States*, 116 Fed. Cl. 276, 286 (May 30, 2014) (citations omitted).  This somewhat amorphous standard has often been defined not by what it includes, but rather by what is lacking in cases in which a reasonable basis has been found not to exist.  Typically, reasonable basis is not found when "fundamental inquires [sic] are not made." *Di Roma v. Sec'y of HHS,* No. 90-3277, 1993 WL 496981, at *2 (Fed. Cl. Spec. Mstr. Nov. 18, 1993).  Additionally, a case may have a reasonable basis when filed, but may lose reasonable basis during the pendency of the case. *Perreira v. Sec'y of HHS,* 33 F.3d 1375, 1376-77 (Fed. Cir. Aug. 31, 1994); *McNett v. Sec'y of HHS,* No. 99-684V, 2011 WL 760314, at *6 (Fed. Cl. Spec. Mstr. Feb. 4, 2011).  Furthermore, the burden lies with petitioner to "affirmatively demonstrate a reasonable basis." *McKellar v. Sec'y of HHS*, 101 Fed. Cl. 297, 305 (Nov. 4, 2011).  Some of the factors considered when assessing reasonable basis include: "'the factual basis, the medical support, jurisdiction issues', and the circumstances under which a petition is filed." *Chuisano*, 116 Fed. Cl. at 288 (citing *Di Roma,* 1993 WL 496981, at *1).  Neither the fact that no medical records or supportive expert opinion was filed nor the fact that the claim was filed beyond the statute of limitations automatically negates a finding of reasonable basis. *Chuisano*, 116 Fed. Cl. at 288 (citations omitted).  Furthermore, "[a] looming statute of limitations does not forever absolve a petitioner from his or her obligation to proceed with a reasonable basis to support his claim, at least not if the petitioner hopes to recover any fees and costs." *Id.* at 287 (citations omitted).

In the present case, the undersigned finds that the petitioner had a reasonable basis for filing his claim. Here, the petition was filed on September 8, 2014, close to three years after petitioner received the allegedly causal vaccination and started to experience symptoms. Furthermore, petitioner's counsel's billing records show that petitioner sought representation from CHCC around February of 2012, about one and a half years before the petition was filed. Motion (Tab A) at 1.  Petitioner's counsel and his staff spent significant time attempting to have petitioner return his "client info packet" and once this was received, petitioner's counsel began to locate and obtain petitioner's medical records. *Id.* at 1-4. Before the petition was filed, petitioner's counsel contacted petitioner to have him draft a narrative, gathered petitioner's numerous medical records, analyzed the medical records, which based upon the petitioner's complaint following receipt of his vaccination, suggested that a compensable case was being filed. *Id.* at 1-17. Counsel prepared all of the documents for filing. *Id.* Therefore, I find that petitioner's counsel fulfilled his duty to investigate the claim and did so through extensive discussions with Mr. Hinojosa and his family, along with a review of the medical records received.

Petitioner presented enough evidence to initially prove that he had a viable claim at the time of the filing of the petition, along with the requisite citations to medical records, envisioned under the Vaccine Act. *See generally* § 11(c); Pet. at 1-17. A day after filing his petition, petitioner filed multiple sets of medical records from various providers along with affidavits. Medical Records, ECF Nos. 5, 6, 7. A statement of completion was filed on the same day. Statement of Completion, ECF No. 8.  At the initial status conference, held about a month after

6

the filing of the petition, both parties indicated that the record appeared complete.  Order, ECF No. 11.

Furthermore, petitioner had the factual support necessary to proceed as Mr. Hinojosa's symptoms – fatigue, numbness, and weakness in his extremities - are similar to those suffered by many other petitioners who have been found entitled to compensation, particularly those petitioners with a demyelinating motor polyneuropathy. Petitioner had been a healthy male until after vaccination who rarely visited his primary care physician. *See generally* Pet. Ex. 2; 15. Additionally, many medical providers referenced his vaccination when reporting his symptoms and noted the temporal association. *See generally* Pet. Ex. 7; 10. Until respondent filed the Rule 4(c) report, petitioner did not know respondent's views on his claim; when respondent stated that she was opposed to compensation, petitioner's counsel attempted to obtain an expert to opine on petitioner's claim, a logical sequence of events. When his counsel was unable to obtain an expert report, petitioner decided to dismiss his claim. Petitioner's claim was still feasible, until petitioner's counsel was unable to obtain an expert, particularly given the similarity of his symptoms to those of petitioners with successful claims.

Respondent appears to be arguing that petitioner should have obtained an expert report prior to filing his claim; this would effectively raise the bar for filing from "reasonable basis" to "likelihood of success." A heightened filing standard would likely deter future individuals who have sustained vaccine injuries from filing. The ultimate purpose of the Vaccine Program is to provide relief for those who have sustained vaccine injuries, and the program has been structured with minimal barriers to relief in order to best effectuate that purpose. Denying that a petitioner had a reasonable basis for filing his claim based on his failure to ensure that his claim would be supported by an expert before he even filed would be in contravention of the program's intentions. Because this claim fit the profile of many cases that have since settled; retaining an expert and incurring the cost before the government gave an assessment of the case would likely be seen as an unnecessary and premature expense as stated in *Guerrero*, petitioners are strongly discouraged from preemptively providing expert reports, as it results in unnecessary costs to the program. *Guerrero v. Sec'y of HHS*, No. 12-689V, 2015 WL 3745354 n.3 (Fed. Cl. Spec. Mstr. May 22, 2015), *rev'd in part on other grounds,* 124 Fed. Cl. 153 (2015).

Respondent has previously cautioned petitioners against filing expert reports before receiving an order to consult an expert. Given respondent's previous position on this issue, the Court is not inclined to indulge respondent's whim of modifying the standard for reasonable basis in order to avoid paying attorneys' fees.

The petitioner had a reasonable basis upon which to file this claim.  The undersigned has reviewed the billing records submitted with petitioner's request. In the undersigned's experience, the request appears reasonable, and the undersigned finds no cause to reduce the requested hours or rates.

### 2. Challenges to attorneys' rates.

Respondent reiterates the arguments in *McCulloch* by stating "[r]espondent stands by the arguments and evidence she put forth in *McCulloch* . . .[however she] has determined that her resources are not wisely used by continuing to litigate the issues addressed in that decision." Response at 11. Instead, she "defers to the special master's statutory discretion in determining a reasonable fee award." *Id.*

The undersigned fully agrees with the *McCulloch* analysis regarding appropriate hourly rates for the attorneys in the CHCC law firm and adopts the same reasoning in this case. Furthermore, the undersigned has reviewed the billing records submitted with petitioner's request. In the undersigned's experience, the request appears reasonable, and the undersigned finds no cause to reduce the requested hours or rates.

### 3. Additional attorneys' fees for petitioner's reply brief.

Petitioner requests additional attorneys' fees in the amount of $4,789.00 for preparing his reply to respondent's response on his application for fees and costs; no response was filed after petitioner filed his supplemental fees motion.

Respondent has taken the position that formal applications for attorneys' fees and costs must now be filed with the Court in every case for which an attorney is seeking fees and costs. To that end, though she defers to the special masters to grant or deny these motions, she has questioned reasonable basis in many cases that have been dismissed at some point after filing. While there have been occasions where reasonable basis is rightly contested, this was not one of them. Where reasonable basis, or any challenge is raised against a petitioner's application for fees and costs, it is inevitable that petitioner will respond and defend his or her position. To that end, a great deal of time must now be expended by petitioner in defending fees and costs in a given case, resulting in additional attorneys' fees.

In this case, Ms. Ciampolillo spent 11 hours drafting her Reply and reviewing case law, which took her staff 7.4 hours to research. Ms. Ciampolillo wrote a 23 page well-reasoned and detailed Reply to the challenges raised by respondent, highlighting the facts and medical records supporting reasonable basis and pointing out that many cases similar to the facts in this one have been resolved in favor of the petitioner. *See generally* Reply. The necessity and extent to which petitioner had to defend himself in the context of this matter lends itself to granting petitioner the full amount of fees he has requested. Thus, the undersigned is granting the petitioner's request for an additional $4,789.00 in attorneys' fees.

### V.      TOTAL AWARD SUMMARY

The Vaccine Act permits an award of reasonable attorneys' fees and costs.  § 15(e). Based on the reasonableness of petitioner's request, the undersigned **<u>GRANTS</u>** petitioner's motion for attorneys' fees and costs.

**Accordingly, the undersigned awards the total of $28,739.86[5] as follows:**

- **A lump sum of $28,389.86, representing reimbursement for attorneys' fees and costs, in the form of a check payable jointly to petitioner and petitioner's counsel, Ronald Homer, of Conway, Homer & Chin-Caplan, P.C.; and**

- **A lump sum of $350.00, representing reimbursement for petitioner's costs, in the form of a check payable to petitioner.**

The clerk of the court shall enter judgment in accordance herewith.[6]

**IT IS SO ORDERED.**

**<u>s/Mindy Michaels Roth</u>**
Mindy Michaels Roth
Special Master

---

[5] This amount is intended to cover all legal expenses incurred in this matter.  This award encompasses all charges by the attorney against a client, "advanced costs" as well as fees for legal services rendered.  Furthermore, § 15(e)(3) prevents an attorney from charging or collecting fees (including costs) that would be in addition to the amount awarded herein.  *See generally Beck v. Sec'y of HHS,* 924 F.2d 1029 (Fed. Cir. 1991).

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.